No. 21,772.

J. M. COURTNEY, *Appellee*, v. AMERICAN ZINC, LEAD & SMELTING COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

DAMAGES—*Fumes and Gases from Smelter—Injury to Growing Crops and to Live Stock—Evidence—Findings*. In an action to recover damages for injuries to growing crops and to live stock alleged to have been caused by fumes and gases from defendant's smelter, *held*, on the facts stated, there was sufficient evidence to sustain the findings and judgment in plaintiff's favor.

Appeal from Montgomery district court; JOSEPH W. HOLDREN, judge. Opinion filed March 8, 1919. Affirmed.

*Altes H. Campbell,* of Iola, and *A. W. Kopp,* of Platteville, Wis., for the appellant.

*G. H. Lamb,* of Yates Center, *A. R. Lamb,* and *C. A. Reed,* both of Coffeyville, for the appellee.

The opinion of the court was delivered by

PORTER, J: The defendant appeals from a judgment in plaintiff's favor for damages caused by smoke, fumes and gases from the defendant's smelter, which destroyed plaintiff's crops and killed or injured his live stock.

The plaintiff was in possession of a 12-acre tract of land adjoining defendant's smelter on the east, which he had rented for a number of years, and upon which there was growing an acre of strawberry plants, a number of bearing grapevines, and various other crops. On another tract near by, occupied by plaintiff as a residence, there were bearing peach trees and a garden. Three or four blocks west of the smelter plaintiff owned several lots upon which there were growing strawberry plants. Another tract of 40 acres was used by plaintiff as a pasture for his horses and other live stock. The petition alleged and the plaintiff's evidence tended to prove that smoke and fumes were blown over each of these tracts at different times, and that smelter smoke contains sulphur, arsenic, lead and zinc in various combinations, all of which are liable to poison animals, and to destroy growing vegetation.

The special findings were in favor of plaintiff's contentions. There are nine specifications of error, several of which are presented and argued together. Upon a careful examination of the 200-page abstract we are unable to concur in the defendant's claims numbered 1, 2, and 5, that there is no evidence to support certain findings of the jury with respect to the damages sustained by the plaintiff, or to sustain the finding that these damages were caused by fumes and gases that came from the defendant's smelter. In order to answer these contentions of the defendant it would be necessary for us to weigh the testimony. The third and fourth points urged are that certain findings are "against the clear preponderance of the evidence," and it is quite manifest that these cannot be considered, because they require the court to weigh the conflicting evidence.

It is insisted that because plaintiff's evidence showed that his strawberry plants were in excellent condition when they were mulched down in the fall of 1916, the jury were not justified in arbitrarily saying that they must have been injured by something from the smelter because they did not produce a good crop in the year 1917. The facts referred to furnished merely a basis for an argument to the jury. It is argued that defendant's demurrer to the evidence should have been sustained because of the total absence of any evidence that the animals died from any poison that came from the smelter, and because of the positive testimony of plaintiff's two veterinarians, on cross-examination, that in their opinion the horses and mares did not die from smelter poisoning, but from other diseases. It is true that the veterinarians were careful not to state their positive opinion that the animals had died from smelter poisoning. They were not called as witnesses for the purpose of testifying to their opinion upon the disputed fact, but of showing that fumes given off by smelters sometimes contain sulphur and arsenic, lead and zinc, and their combinations, and that any and all of these might poison animals. It was for the jury to say, in view of all the testimony, including that of the experts, whether or not the symptoms exhibited by the animals were caused by smelter poisoning.

In *Wichers v. New Orleans Acid & Fertilizer Co.*, 128 La. 1011, it was held:

"A plaintiff sustains the burden of proof when he shows that at the time his plants were destroyed and damage suffered, the defendant's factory was freely emitting fumes, gases, and acids, which are destructive of plant life, and that the wind was blowing the fume, etc., towards his premises, some 900 feet distant, and that there was no other known agency of destruction existing in the vicinity." (syl. ¶ 2.)

(See notes in the same case in 1 N. C. C. A. 697.)

If there was inconsistency in the statements and testimony of the experts called by the plaintiff, the defendant would not be entitled to have the demurrer sustained for that reason. The effect of their testimony was properly submitted to the jury. (*Acker v. Norman,* 72 Kan. 586, 84 Pac. 531.)

It is said that the court erred in permitting the veterinarians to testify that in their opinion the stock in the vicinity of the smelter had been made sick from smoke and fumes from the smelter, without proof that the smoke and fumes contained deleterious substances. The contention is that the evidence

Courtney v. Smelting Co.

was incompetent until there had been expert evidence that zinc, lead and sulphur emanated from the stacks. We do not think it was necessary to produce testimony to show the precise nature of the gases and fumes which came from the stacks of the defendant's smelter. There was considerable circumstantial evidence which tended to show that at some seasons of the year, when the prevailing winds were in one direction, the crops on lands opposite thereto and in the vicinity of the smelter were affected or destroyed by the fumes; and that these fumes had an effect upon the health of live stock. It is said that it was error to admit evidence as to the condition of other premises and the experiences of other farmers located at varying distances and in different directions from the smelter, but we think this was competent for the purpose of proving what the defendant insists was not proven; that is, that whatever the fumes consisted of, they were poisonous and deleterious to live stock.

During the trial the plaintiff called a witness who lived about a mile from the smelter, and he was asked whether he had had a conversation with Mr. Hinkle, who was in the smelter office, and who sometimes went and examined claims of this character against the company. The witness testified that Mr. Hinkle came to his pasture and looked after his stock in 1916; that "the smoke was very bad there, but not so bad as lots of times, and Mr. Hinkle told me that if your stock won't eat it they'll breathe them, and——." The answer was interrupted by an objection which was overruled. The witness further testified that the conversation was about his young mules, and that he had no conversation with Mr. Hinkle about cattle. The admission of this testimony is urged as reversible error. It is said there was no proof that Hinkle was an officer of the company or that he had authority to make any statements to bind the company; and the usual authorities are cited in support of the contention that the declarations of an agent, in order to bind his principal, must not only come within the scope of the agent's authority, but must also be made by the agent while he is transacting his principal's business and be connected therewith. We think that whether the evidence was admissible or not, all Mr. Hinkle was shown to have said could not have prejudiced defendant or affected the merits of the case.

We find no error in the record, and the judgment is affirmed.